**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STEPHEN KLEINSCHMIT,<br><br>                Plaintiff,<br><br>v.<br><br>UNIVERSITY OF ILLINOIS CHICAGO;<br>TIMOTHY L. KILLEEN, in his official<br>Capacity as President of University of<br>Illinois System; and MARIE LYNN<br>MIRANDA, in her official capacity as<br>Chancellor of University.<br><br>                Defendants. | **COMPLAINT** |

1. 42 U.S.C. § 1981 protects against both direct racial discrimination and retaliation based on complaints of discrimination. *See CBOCS West, Inc. v. Humphries,* 553 U.S. 442 (2008). And yet Defendant University of Illinois Chicago has engaged in both.

2. Plaintiff Professor Stephen Kleinschmit was a loyal, hardworking, and dedicated clinical associate professor at the University of Illinois Chicago ("UIC" or "The University") in the Department of Public Policy, Management, and Analytics. During that time, however, he observed that multiple hiring and funding programs were either a) explicitly designed to use race as a qualification in hiring decisions or b) being subverted to favor nonwhite applicants and faculty. When he complained about this unlawful behavior, he was terminated—ostensibly due to budget cuts, yet the University retained faculty hired under a non-competitive, racially preferential

1

hiring program, and soon after advertised a new job opening in his old department stating "members of a recognized underrepresented group are particularly encouraged to apply."

3. The facts of the situation demonstrate that Professor Kleinschmit was targeted for nonrenewal of his contract because he spoke up about racially discriminatory hiring programs, and that his termination was illegal.

4. The University of Illinois system and UIC substantially shifted resources away from the support of academic units to meet its unconstitutional race-based hiring goals, instead directing funds and a substantial portion of its hiring to racially discriminatory and noncompetitive hiring programs.

5. UIC is a public university and therefore a state actor that is obligated to respect the right to equal protection of the laws—and cannot under any circumstances discriminate on the basis of race or other suspect classifications.

6. UIC does not care about this obligation: it views it as morally defensible to discriminate against white candidates, particularly men, in favor of their preferred demographic groups to achieve its notions of social justice and equity. In service of its goal, UIC fired Plaintiff because he had the wrong-colored skin. That is unconstitutional, and this Court should put a stop to it.

## JURISDICTION AND VENUE

7. This case arises out of 42 U.S.C. § 1981. The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331.

8. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because a) Defendant is located in Cook County, Illinois, and b) all the events giving rise to the claims occurred in Cook County, Illinois.

9. University of Illinois Chicago (UIC) is a public research university. UIC receives federal money for research (including 75% of its research funding) and for student financial aid.

## PARTIES

10. Professor Stephen Kleinschmit was a clinical associate professor at UIC. At all times relevant to this complaint, he lived in Cook County, Illinois.

11. UIC is a public university headquartered in Cook County, Illinois.

12. Timothy Killeen is the President of the University of Illinois system and is sued in his official capacity.

13. Marie Lynn Miranda is the Chancellor of the University of Illinois Chicago and is sued in her official capacity.

## FACTS

*Plaintiff's employment at UIC*

14. From August 16, 2017 to August 15, 2023, Professor Kleinschmit was employed as a clinical associate professor at UIC in the Department of Public Policy, Management, and Analytics (PPMA) (having been renamed from the Department of Public Administration during his employment) at the College of Urban Planning and Public Affairs (CUPPA).

15. Professor Kleinschmit joined the faculty as a clinical assistant professor in 2017 and was promoted to clinical associate professor in 2020. The normal probationary period before promotion is six years, but he achieved this in roughly half that time because of exemplary performance and existing experience.

16. Every year of his employment, Professor Kleinschmit received positive performance evaluations and related merit-driven bonuses, and salary increases that justified his early promotion.

17. During his time at UIC, Professor Kleinschmit was an exemplary member of the faculty who positively contributed to his department and University and excelled as a scholar in his field, with an unusually high degree of productivity and visibility as a non-tenure-track faculty member.

18. His accomplishments included serving as the president of a successful regional conference he founded, serving on the national council of the American Society for Public Administration, and winning a national award for his work in developing the nascent field of public data science.

19. In 2020, Professor Kleinschmit became the director of the new Master of Science in Civic Analytics (MSCA) after leading the degree through university processes and approval by the Illinois Board of Higher Education. The MSCA program is one of the first public sector data science graduate programs in the country. He also became the advisor for his department's civic analytics concentration within its Bachelor of Arts in Public Policy program.

20. Professor Kleinschmit's MS in Civic Analytics program was so integral to his unit's future plans that the department renamed itself in 2022 to incorporate his contribution: it is now the Department of Public Policy, Management, and Analytics.

21. In 2019, Professor Kleinschmit won the national NASPAA Data Science Curriculum for Public Service Award for his significant contributions to the pedagogy of his field; his work became the basis for similar programs and degree concentrations across the nation.

22. Professor Kleinschmit's talent for curriculum development was also noted by internationally prominent scholars, who invited him to participate in a global initiative that became the leading framework for digital skill education worldwide.

23. During his time as the MS in Civic Analytics director, Professor Kleinschmit personally witnessed conversations about expressly using race as a determinant for hiring faculty members for UIC's new "Bridge to Faculty" ("B2F") program, as well as within competitive searches for tenure-track faculty hiring.

24. During a departmental meeting in 2019, while discussing candidates for a tenure-track search, one member of his department's faculty objected to the potential hiring of a qualified candidate, saying "We aren't going to hire another white guy, are we?"

25. When reviewing the search committee candidate rankings, members of the department spent an extended period of time discussing the racial characteristics of

the candidates and routinely lamented the race and gender makeup of the applicant pool.

26. The Plaintiff was immediately uncomfortable with the B2F program and immediately recognized its racially discriminatory intent.

27. After researching federal nondiscrimination law and the mechanisms of B2F program, he came to realize that the university program was illegal.

28. As part of his employment, Professor Kleinschmit was directly involved in the department's employment review processes, which gave him firsthand knowledge of the B2F program, as well as other raced-based hiring, compensation, and retention initiatives at the university.

29. Professor Kleinschmit participated in the design of recruitment advertisements, the review and selection of candidates, attended candidate research presentations, and the deliberations of selected B2F program finalists.

30. As part of meetings required by his employment, Professor Kleinschmit sat through conversations about what races and sexual orientations count as diverse, and what characteristics would increase the likelihood of the department being awarded a B2F postdoc. As its discriminatory intent was clearly understood from the university's guidance, the department used such criteria when constructed its B2F applications.

31. The department was so successful in crafting its candidate searches using discriminatory criteria that it received two B2F postdocs in the first year of the program's operation, of which ten were given out university-wide.

6

32. Dr. Kleinschmit has a Ph.D. in Public Administration, the preeminent academic credential for academics researching and teaching the management of public agencies. He has doctoral-level training in ethics, public management, human resources, and organizational behavior, and has an expert level of competence in these domains.

33. Professor Kleinschmit taught administrative ethics, organizational reform and change, and leadership courses in the Master of Public Administration (MPA) program at the UIC. He previously instructed graduate courses in ethics, public management, leadership, and legal foundations of public administration courses in the MPA programs at two other universities. Additionally, he has published academic research in the public ethics domain, and served as a board member for his field's leading ethics journal.

34. Professor Kleinschmit's instructional experience and search committee training made him realize that he was witnessing a staggering amount of illegal behavior emerging across the university concerning discriminatory recruitment and hiring. He initially withheld his criticism because he was a non-tenure-track faculty member and feared being ostracized and retaliated against.

35. Professor Kleinschmit eventually revealed his concerns to several members of his department and college, with the belief that not doing so would make him a participant in illegal activities for which he would be held liable.

36. UIC's academic and administrative units regularly use race as a primary—or even only—determinant in hiring decisions.

37. Specifically, illegal racial discrimination is present in at least five UIC programs or initiatives: the Bridge to Faculty Program (B2F); Advancing Racial Equity Initiative/ARE Strategic Plans; the External Candidate of Outstanding Achievement/Target of Opportunity Hiring (ECOA/TOH) waiver program; the Under-Represented Faculty Recruitment Program (UFRP); and the Minority Faculty Recruitment Program (MFRP).

38. These programs, paired with the university's activist culture, resulted in thousands of discriminatory candidate searches being conducted for administrators, tenure-track faculty, nontenure-track faculty, staff, and graduate assistants from 2019 until the present day.

39. Due to the university's Advancing Racial Equity (ARE) initiative, racial discrimination is now fully integrated into every academic and administrative unit's strategic planning and hiring.

40. Publicly available documents online, and documents requested through Freedom of Information Act requests, reveal clear statements of intent and actions taken that illegally discriminate in hiring, promotion, tenure, and retention.

41. The ARE Initiative caused UIC to systematically disincentivize and limit white employment in hiring and retention, particularly for men, across the entirety of the university.

42. The University Faculty Senate on July 29, 2020 released the UIC Senate Statement on Black Lives Matter, which asked the white faculty and administrators to "acknowledge their white privilege and power, and to commit to

take action against systematic racism through anti-racist action," specifically mentioning a focus on race in "faculty and student recruitment, faculty and student retention" in its goals.

43. Numerous colleges, departments and administrative units at UIC posted solidarity statements in support of the Black Lives Matter movement on their websites, including statements that denigrated White people. Several units mentioned a desire to end white privilege, white supremacy, and "the patriarchy."

44. The Plaintiff's own college posted such a statement on June 4, 2020, stating "we act and stand beside those who march for justice and social equity" and that the college takes action "to vanquish racial injustice."

45. On April 21, 2022, the UIC Faculty Senate released the UIC Senate Statement in Support of Critical Race Theory, which "declares its support for Critical Race Theory" and acknowledges that "CRT rejects claims of color-blindness," "exposes the ways that racism is cloaked in . . . values of professed 'neutral' policies, principles, or practices" and "challenges the ways private and public institutions and systems create and contribute to racial inequality." It further states that "as Chicago's leading public academic institution, issues of racial justice and racial equity are center to of [sic] our mission."

46. In 2023, Professor Kleinschmit was contacted by a colleague who relayed their own story of being denied a tenure-track position after interviewing, being told that "they were the wrong race this year."

47. UIC tolerated and continues to tolerate antisemitism, so much so that former Sociology Department chair Barbara Risman blasted the university in a *Chicago Tribune* editorial on March 27, 2024. Titled "Does UIC want to Outcompete the Ivies on Antisemitism?" the article mentioned that multiple academic and administrative units posted statements of Palestinian solidarity on their state-owned university websites.

48. The article mentions that UI President Tim Killeen "is now requiring each campus to craft policies for the appropriate use of issuing statements on university websites that use state resources." The numerous Black Lives Matter and Palestinian solidarity statements posted by UIC departments and centers across the university demonstrated an extensive pattern of institutional activism and disregard of state and federal law.

49. UIC Office of Access and Equity staff provided guidance and support to departments to help craft position announcements that hid their discriminatory intent. Search committees created advertisements that were inflected with requirements for scholars that research subjects like "disparities, social justice, underrepresented populations, critical race theory, decolonization, minoritized populations" and other terms for activist scholarship.

50. These terms were intended and used as proxies for race to circumvent nondiscrimination law.

51. UIC required intentionally discriminatory "DEI statements" of applicants, which were used as a thinly veiled screening mechanism for discriminatory hiring.

52. DEI statements were used to justify and provide cover for intentional discriminatory hiring, and were also used as ideological litmus tests that compelled agreement with political goals and speech as a precondition of employment at the university.

53. An institutional climate survey at the University of Michigan released in 2024 found that DEI activities created a deteriorating campus climate, made students less likely to interact with people of different races, religions or political orientations, and created a "culture of grievance." The Plaintiff attests that a similar dynamic existed at UIC and became overwhelming at UIC after the summer of 2020.

54. UIC directed academic units to incorporate diversity statements and activities into departmental norms and guidelines for promotion and tenure. As a condition of continued employment, these guidelines would require engagement in compelled political speech and activities that may be illegal and against their conscience.

55. DEI activities were not, and are still not, standard activities prevalent in academic careers. Their inclusion in hiring, promotion and tenure processes is clearly intended to advantage minority scholars in these processes, compel faculty political speech, and abruptly change the demographic composition of the university's administration and faculty.

56. The UIC Office of Access and Equity is tasked with equal employment opportunity oversight and compliance. On information and belief, it is the office that created and implemented the B2F and ARE programs discussed herein.

57. The Bridge to Faculty (B2F) program is administered by the UIC Office of Diversity, Equity & Engagement.

58. The B2F program is billed as "a recruitment program designed to attract underrepresented postdoctoral scholars with the goal of direct transition to a tenure-track junior faculty position after two years."

59. The program's goals explicitly include the intention to "diversify our faculty, with particular emphasis on departments with low or no presence of faculty who are underrepresented in their field."

60. The B2F program is intentionally racially discriminatory.

61. The B2F program, on information and belief, allows postdoctoral fellows being hired through less-competitive and noncompetitive searches and transfers them into permanent tenure-track employees without competitive searches being conducted, in conflict with nondiscrimination law.

62. The Office of Access and Equity's guidelines and communications on B2F pushed faculty to believe that the illegal discrimination they were performing was legally justifiable, despite being in direct opposition to the principles of nondiscrimination emphasized in search committee training.

63. In UIC's Academic Hiring manual (Office for Access and Equity, Rev. Sept. 2022) section "Positions That Do Not Require A Search," states that postdoctoral

12

fellows are exempted from competitive searches, but includes the statement, "Reminder: Any individual appointed to a position without a search being conducted must be informed that subsequent offers of employment will not be made to them unless they are selected as the result of an approved search."

64. The manual details conditions by which competitive searches may be waived; the second bullet point is "External Candidate of Outstanding Achievement," which includes "Appointments included in Special Recruitments such as: Under-Represented Faculty Recruitment Program (UFRP) or Bridge To Faculty."

65. The Bridge to the Faculty program exemption was justified as an expansion of a category of noncompetitive hiring that was intended for highly accomplished senior scholars. An "External Candidate of Outstanding Achievement" is intended for direct hires, usually senior scholars with a substantial record of accomplishments and contributions to their fields of study.

66. Being a racial minority in itself is not an outstanding achievement, and a postdoctoral fellow by definition does not have a record of outstanding achievement warranting a noncompetitive tenure-track appointment. A postdoctoral fellowship is intended for scholars who seek additional research skill development to be competitive for tenure-track appointments.

67. The B2F program is funded externally from department funds, meaning that academic departments get "free faculty," bearing no cost for the career of the faculty member.

13

68. The B2F program's external funding creates an incredibly strong incentive to pursue these positions, as some academic units with declining enrollments need fellows to replace the instructional capacity of faculty they have lost, are unable to retain, or are unable to replace due to budget cuts.

69. The B2F program structure reveals that the UI system and UIC administration chose to purposely withhold substantial financial resources to support academic units. In doing so, the program undermined the autonomy and stability of academic units, transitioned faculty hiring away from hiring and retaining faculty sourced from merit-based competitive searches, and led to layoffs due to artificial resource scarcity.

70. In some academic units, the B2F program has consisted of a majority or the entirety of academic hiring at UIC since the program's inception, systematically replacing competitive hiring with non-competitive and discriminatory hiring processes.

71. The competition for B2F fellows strongly incentivizes applicants to invent, misrepresent, or frame previously non-existent lines or activist lines of research as being critical to departmental needs and core to their respective fields. B2F applications reveal examples include program needs to address "issues of race and power" in undergraduate mathematics education and incorporate DEI principles into biomedical engineering.

72. B2F applications also indicate in some instances the desire of programs to reorient their entire academic curricula to center activism and racial justice as their central organizing feature.

73. There are strong incentives to not let the B2F searches processes fail to find a 'diverse' candidate—because failure to hire a diverse candidate will mean that department simply loses the ability to hire any candidate at all.

74. The aforementioned incentive results in hires who are unable to teach core subjects in the department's programs, because in some cases they have little or no formal education in their department's home discipline, as they were hired to increase "diversity" and not to fill an existing departmental need.

75. Departments must sometimes create new special topics courses or specialized courses that do not currently exist in the department's curriculum to provide a reason for the B2F fellow's existence. Such courses are heavily oriented toward racism and social justice and were not present in the Plaintiff's department until the B2F fellows were hired.

76. There is a strong incentive to pass along underperforming faculty through review processes within the early stages of the postdoctoral fellowship and tenure-track appointment.

77. Professor Kleinschmit had conversations with faculty members in his department who expressed their reservations about the fitness of the B2F fellows to meet the high tenure expectations that were required in the department.

15

78. The B2F program's design creates strong incentives for departments to have de facto different evaluation standards for competitive search faculty than B2F fellows.

*Advance Racial Equity Initiative/ARE Strategic Plans*

79. UIC requires all academic and non-academic units to create "Advancing Racial Equity" plans that codify their intent to engage in racially discriminatory behavior and establish racial quotas in academic and administrative hiring.

80. UIC's Office of the Chancellor, Office of the Provost, and Office of Access and Equity required each University department to create a plan to Advance Racial Equity (ARE), detailing specific actions the department proposed to take to increase faculty diversity.

81. Units were then required to submit compliance reports detailing their progress towards their ARE plan goals to the Office for Access and Equity.

82. OAE's publicly available ARE template, provided to all academic and administrative units, openly suggests illegal goals such as "Hire three POC." Available examples of academic unit plans available on the UIC website openly state their intent to engage in discriminatory hiring, establishing measurable goals that include certain numbers or percentages of "underrepresented groups." Academic and administrative units are required to submit progress reports, which detail the actions undertaken to meet their goals.

83. By reviewing the example documents available from UIC's own website, it is apparent that these units followed through on their plans and detail specific actions

taken, where they discuss the race and ethnicities of their hires, the use of race as a principal determinant, and detailed future plans for racial hiring. In January 2025, these example documents had been removed from the university website and placed in an access-controlled Dropbox account, and were taken completely offline in February 2025.

*External Candidate of Outstanding Achievement / Target of Opportunity Hiring*

84. The External Candidate of Outstanding Achievement/Target of Opportunity waiver program (ECOA/TOH) is intended to advance the University's mission by recruiting prominent scholars to the University.

85. ECOA/TOH is intended to recruit prominent scholars away from other universities using noncompetitive search processes. The objective is to increase UIC's prestige and funding by bringing those scholars' significant research reputations and grant funds to UIC.

86. The designation allows hiring departments to waive competitive search processes. The ECOA justification was expanded to include the Under-Represented Faculty Recruitment Program (UFRP) and Bridge to the Faculty (B2F) program.

87. The program is being used not for that purpose alone, but has become a mechanism to hire an abnormally high percentage of non-white faculty in recent years on a discriminatory basis, in direct violation of state and federal civil rights law.

88. The OAE Faculty Hiring Manual states that "Positions should generally be filled through an open and competitive search process; however, on occasion, some

appointments are granted a waiver of the standard search process. A waiver may be requested when an urgent and unforeseen circumstance arises requiring the immediate filling of a vacancy to further the campus' mission and objectives."

89. The needs allegedly filled by this program were neither urgent, unforeseen, nor in need of immediate filling.

*The Under-Represented Faculty Recruitment Program and the Minority Faculty Recruitment Program*

90. The Under-Represented Faculty Recruitment (URFRP) and Minority Faculty Recruitment Programs (MFRP) permanently subsidize a substantial portion of faculty salaries.

91. The MFRP "has been operational since 1989 for hiring Black, Latino, and Native American candidates to tenured or tenure-track positions.".

92. The URFRP is an "extension" of the MFRP.

93. The programs have doled out $85 million in salary support and $12 million in research support as of 2021; the figures are undoubtedly higher now.

94. Black, Latino, and Native American faculty are eligible for the URFRP automatically; Asian, Native Hawaiian and Other Pacific Islanders are eligible if they are "being recruited into disciplines in which their groups are specifically underrepresented."

95. URFRP and MFRP create a substantial financial incentive to hire minority candidates within allegedly competitive searches.

18

96. Taken together, these five programs paint a clear picture of pervasive racial discrimination in employment practices at UIC and have undermined the academic integrity of the institution.

*UIC's Illegal Retaliation Against Professor Kleinschmit for Opining on the Illegal and Discriminatory Nature of These Hiring Programs.*

97. Professor Kleinschmit objected to the illegal nature of the B2F, other racial hiring programs, and UIC's descent into institutional activism in a series of conversations with several faculty and administrators from late 2019 until his termination in 2023. These attempts to point illegal activities out were not well received.

98. On August 15, 2023, Professor Kleinschmit's employment at UIC was terminated.

99. Immediately prior to his termination, Plaintiff's annual salary was $94,500 for a nine-month contract, with an additional $10,000 stipend for administrative work as director of the MS in Civic Analytics program.

100. The official explanation for Professor Kleinschmit's firing was that it was due to budget cuts.

101. The Plaintiff's college selected a new dean in Spring 2022. When the new dean, Stacey Swearingen-White arrived at his college for Fall 2022, the Plaintiff expressed his concern over issues of recruitment strategy and the racial climate of the college during three separate informal meetings with the Dean. He

stated during one such meeting that he hoped the Dean would "clean up" the College's elevator and stairwells, which had become heavily defaced with graffiti and activist political slogans - but only portions of the main stairwell that included profanity were repainted.

102.     During an all-college meeting in Fall 2022 attended by Provost Karen Colley, Dean Swearingen-White stated her intent to make his college CUPPA "the most diverse it can be," and that the college must center social justice as its mission and "provide safe and comfortable spaces" for students and compelling the college to racial-justice activism.

103.     Professor Kleinschmit objected to this, sharing his view that the college was shutting the door to a broader set of perspectives on important matters of public concern in the interest of making students "comfortable," and that comfort is not the point of intellectual discourse in public affairs. There was a slight pause, and Dean Swearingen-White and Provost Colley exchanged what could be described as a "knowing glance."

104.     In January 2023, the Plaintiff noticed that his department chair had canceled numerous regular biweekly meetings over the previous two months. Professor Kleinschmit recognized this as an indicator of an impending layoff and asked a senior faculty department member, who was auditing his course, if he should be worried about being laid off due to budget cuts.

105. That faculty member stated they were unaware of any cuts, though he later found out this member had attended the department's Faculty Advisory Committee meetings and as early as October 2022 was aware of impending layoffs.

106. Professor Kleinschmit then approached the department chair, who reluctantly confirmed that his nonrenewal was a reality; a week later, he formally confirmed this in a meeting with his chair and the dean in February 2023.

107. On or about March 2023, Professor Kleinschmit sent an email to Interim Chancellor Javier Reyes to request a meeting. In this email he stated that he felt that his nonrenewal damaged the institution's reputation, that the university was failing to align its resources with its mission, and questioned how he was being laid off for budget cuts when the university was engaging in discriminatory hiring. Reyes referred the Plaintiff to Provost Karen Colley, and the Plaintiff sent the same email to the provost, who arranged a meeting via Zoom.

108. At the meeting, the Plaintiff brought up the exact points mentioned in the email, also including the fact that he was a veteran, a category that contributed to the diversity of the institution.

109. The Provost was silent and did not offer any response or engage with the Plaintiff's argument about misallocation of university resources, his status as a veteran, and froze briefly before refusing to respond to his contention that the university was engaged in discriminatory hiring. She stated her support for CUPPA Dean Swearingen-White's decision for nonrenewal and concluded the meeting.

21

110.     Professor Kleinschmit canceled his follow-up meeting with Dean Swearingen-White after his department chair convinced him that there was no point to doing so. The plaintiff also feared losing an important point of support and reference for his employment search, and because he credibly feared being retaliated against in his search for new employment by the Dean.

111.     Professor Kleinschmit was not invited to participate in the annual UIC Urban Forum event on April 19, 2023 titled "Can Data Deliver? Harnessing Data-Driven Solutions for Urban Challenges." This was despite him being the director of the MS in Civic Analytics program and a national leader in this domain. Several attendees from Chicago's civic technology community contacted Professor Kleinschmit to ask why he was not participating in the event.

112.     From subsequent conversations with his former colleagues, it became apparent that Dean Swearingen-White had directed the department not to inform Professor Kleinschmit of his impending layoff. Unlike many universities, UIC does not have a required advance notification period for non-tenure-track faculty, and the Dean intended to inform him of his layoff in June, when there would be little time for or chance of a successful appeal, and the department's faculty was dispersed for the summer.

113.     The manner in which notification was withheld was a substantial departure from field norms, and particularly heinous act to a senior member of the school's faculty with six years of service. Because of this late notice, Professor

Kleinschmit missed the academic job market and was left unemployed for an entire year.

114.     UIC understood the cyclical annual nature of academic hiring and, while it could have given Professor Kleinschmit notice such that he could have sought another position, it chose to hide this information from him, severely limiting his options for future employment, and leading to long-term unemployment.

115.      UIC's discrimination caused Professor Kleinschmit substantial financial stress, the loss of his relationship, and health problems that culminated in his admission to a hospital for a stress-induced cardiac event.

116.     UIC's discrimination against Professor Kleinschmit permanently damaged his professional stature, resulting in loss of academic rank, the decline of the MSCA program, and negatively affected the quality and integrity of the department's academic programs. Additionally, it destroyed or seriously impaired a number of his major research and engagement initiatives that had been developed over the previous decade.

117.   Professor Kleinschmit was one of two non-tenure-track faculty members who were selected for contract nonrenewal at this time. As the only white male, he was let go permanently. The other individual, an Asian woman, was moved to a replacement position within the college, with responsibilities focused on diversity, equity, and inclusion.

118.   Therefore, as a practical matter, Professor Kleinschmit, the only white male faculty member, was the only person UIC actually terminated, as UIC shifted resources to a new job focused on fulfilling its racially discriminatory goals.

119.   While Professor Kleinschmit was being laid off, his college conducted searches for several new administrative hires and a new B2F faculty member.

120.   The B2F application from UIC's Department of Urban Planning and Policy's (UPP) search further demonstrates the motives of this hire: the application, sourced through a FOIA request, denotes that it sought "a scholar with expertise in environmental justice and environmental racism who comes, precisely, from a community of color."

121.   The application also denotes that "by being a member of a community of color, the positionality and lived experience of the B2F Scholar will be better aligned with the lived experiences of communities of color experiencing environmental injustices." This application was endorsed and signed by Dean Swearingen-White.

122.   On information and belief, UI system and UIC leadership allowed significant transfers of resources away from supporting its academic units in order to dedicate all meaningful resources to hiring candidates with the preferred demographic characteristics.

123.   The purported budget deficit that resulted in Professor Kleinschmit layoff was in fact nonexistent: the graduate program Professor Kleinschmit led

24

enrolled a sizeable number of students, enough to support the plaintiff's position financially at UIC.

124.    Rather, the department's deficit came from the substantial decline its other master's programs that were comprised heavily of international students from China, and that cohort was lost to travel restrictions during the COVID-19 pandemic—resulting in a substantial loss of tuition income unrelated to Professor Kleinschmit's program.

125.    In February 2024, about five months after terminating Professor Kleinschmit's employment, PPMA circulated a new job posting for a non-tenure-track position. The job description significantly overlapped with Professor Kleinschmit's responsibilities and stated that "[i]ndividuals who are members of a recognized underrepresented group are particularly encouraged to apply."

126.    Upon seeing the advertised position, Professor Kleinschmit applied to get his job back. But in a conversation with a former colleague, he asked why the department had not contacted him to know that the position was becoming available. It became apparent from the conversation that the department had someone else in mind.

127.    Professor Kleinschmit believes that his repeated advocacy against racial discrimination in hiring drove UIC to retaliate against him because he would not stop objecting to its illegal behavior, as thus no longer constituted a "fit" with the college's professed commitment to social justice and racial equity. His

nonrenewal was only three years after he was promoted to clinical associate professor on an accelerated timeline.

128.     On December 7, 2021 Chancellor Micheal Amiridis, J. Rex Tolliver (Vice Chancellor of Academic Affairs) and Amalia Pallares (Vice Chancellor for Diversity Equity and Engagement) released an Advancing Racial Equity initiative update, in which they openly stated their goal to increase the number of tenure-line Black faculty by 30% by August 2023, naming it a "top priority for the university."

129.     The Plaintiff's treatment was part of a clear pattern of university-wide discriminatory behavior over the past five years that saw substantial changes in the composition of UIC's tenure track faculty, non-tenure-track faculty, and graduate assistant populations.

130.      According to UIC's OIR IPEDS data, between 2019-2023, total Black tenure track (TT) faculty increased by 25%, Hispanic TT faculty increased by 20%, and White TT faculty declined by 4.24%.

131.     Among total non-tenure-track (NTT) faculty, Black NTT faculty increased by 25.4%, Hispanic NTT faculty increased by 37.1% while White NTT faculty (including Professor Kleinschmit) declined by 7.0%.

132.     Among graduate assistants, Black graduate assistants increased by 41.5%, Hispanic graduate assistants increased by 20%, and White graduate assistants decreased by 7.1%, suggesting significant racial discrimination in graduate admissions and the awarding of student financial aid.

133.    The Plaintiff's race was a motivating and/or determinative factor in Defendant's discriminatory and retaliatory treatment of Plaintiff, including without limitation, in terminating him through nonrenewal of contract.

134.    If Professor Kleinschmit were a member of one of the preferred racial groups, the administration would have quickly found the resources to support his continued employment.

135.    The Plaintiff repeatedly and thoroughly highlighted the discriminatory nature of the university's conduct, making him a target of retaliation.

136.    As a direct and proximate result of the discriminatory and retaliatory conduct of Defendant, Plaintiff has in the past has incurred, and may in the future incur, a substantial loss of earnings and/or earning capacity, loss of benefits, and loss of national stature.

137.    Professor Kleinschmit has also lost his leadership of one of the only public-sector data science programs in the country, making it extremely difficult to regain this role at another institution. He has suffered substantially diminished professional stature, diminished career progression and opportunities for advancement, diminished salary, and has undermined his ability to remain a national leader in his field of expertise.

138.    Professor Kleinschmit is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

139.     The Defendants acted with malice and/or reckless indifference to Plaintiff's protected rights.

140.     The Defendants have failed to align UI system and UIC resources to its mission, potentially implicating hundreds of millions of dollars of funds to illegal and racially motivated hiring of administrators, faculty, staff, and graduate assistants.

141.     The Defendants' own IPEDS data suggests widespread discriminatory intent in admission to the university's master's and doctoral programs, and subsequent awarding of student financial aid. Over the past few years, this has directly affected the lives and career trajectories of thousands of students, many who were denied admission and aid to attend their chosen programs for no other reason than their race.

142.     The conduct of Defendants, as set forth above, was outrageous, flagrant, and warrants the imposition of punitive damages against Defendants.

**COUNT I**
**Racial Discrimination – 42 U.S.C. § 1981**

143.     The preceding paragraphs are incorporated as if set forth herein in their entirety.

144.     By committing the foregoing acts of discrimination against Plaintiff, Defendants violated Section 1981.

145.     Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

146.     As a direct and proximate result of Defendants' violation of Section 1981, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

147.     Plaintiff suffered irreparable injury and monetary damages as a result of Defendant's discriminatory acts unless and until this Court grants the relief requested herein.

## COUNT II
### Retaliation – 42 U.S.C. § 1981

148.     The preceding paragraphs above are incorporated as if set forth herein in their entirety.

149.     By committing the foregoing acts of retaliation against Plaintiff, including terminating his employment for criticizing their racially discriminatory practices, Defendant has violated Section 1981.

150.     Said violations were done with malice and/or reckless indifference to Plaintiff's protected rights, and warrant the imposition of punitive damages.

151.     As a direct and proximate result of Defendants' violation of Section 1981, Plaintiff has suffered the damages and losses set forth herein and has incurred attorneys' fees and costs.

152.     Plaintiff suffered irreparable injury and monetary damages as a result of Defendants' retaliatory acts unless and until this Court grants the relief requested herein.

## COUNT III
### Racial Discrimination – 42 U.S.C. § 1983

153.     The preceding paragraphs are incorporated as if set forth herein in their entirety.

154.      Defendants discriminated against Plaintiff on the basis of race.

155.     In discriminating against Plaintiff, Defendants acted under color of law.

156.     Plaintiff is a member of a suspect class and is being unlawfully discriminated against on account of his race.

157.     Defendant has an established policy and practice of making employment decisions on the basis of race, and applied those discriminatory policies and practices to Plaintiff.

158.     There is no compelling government interest in making hiring decisions on the basis of race.

159.      Defendants' race-based hiring decisions are not narrowly tailored to serve, or substantially related to, any compelling government interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks damages and equitable relief in connection with Defendant's improper conduct, and specifically prays that the Court grant the following relief to Plaintiff by:

a. Declaring the acts and practices complained of herein to be in violation of 42 U.S.C. §§ 1981 and 1983;

b. Enjoining and permanently restraining the violations alleged herein;

c. Entering judgment against Defendant and in favor of Plaintiff in an amount to be determined;

d.  Awarding compensatory damages to make Plaintiff whole for all lost earnings, earning capacity, and benefits, which Plaintiff has suffered as a result of Defendants' improper conduct;

e.  Awarding punitive damages to Plaintiff under Sections 1981 and 1983;

f.  Awarding Plaintiff other such damages as are appropriate;

g.  Awarding Plaintiff his attorneys' fees and costs under 42 U.S.C. § 1988 and any other applicable law; and

h.  Granting any such other relief as this Court may deem just or proper, including other equitable and injunctive relief providing restitution for past violations and preventing future violations.


Dated: February 10, 2025                    /s/ Reilly Stephens

                                            Reilly Stephens
                                            James McQuaid
                                            Liberty Justice Center
                                            7500 Rialto Blvd.
                                            Suite 1-250
                                            Austin, Texas 78735
                                            512-481-4400
                                            rstephens@ljc.org
                                            jmcquaid@ljc.org